DECISION
Before this Court is an administrative appeal from a July 10, 2001, decision by the Rhode Island Department of Health, suspending Geraldine Mills's (referred to in this decision as "Appellant" or "Dr. Mills") license to practice medicine for an indefinite period of time. The Appellant seeks reversal of the Board of Medical Licensure and Discipline's decision suspending her license. Jurisdiction is pursuant to R.I. Gen. Laws 1956 § 42-35-15.
I. Case Travel and Facts
On October 19, 1999, the Director of Health issued an Order summarily suspending Dr. Mills's license to practice medicine in Rhode Island. The Board of Medical Licensure and Discipline set a hearing date for October 29, 1999, which, upon Dr. Mills's counsel's request, was continued until November 5, 1999. Subsequent counsel for Dr. Mills requested a further continuance until December of 1999. On December 1, 1999, Dr. Mills received the Board's Amended Specification of Charges charging Dr. Mills with seven counts of unprofessional conduct, in violation of R.I. Gen. Laws § 5-37-5.1.
After receiving the Amended Specification of Charges, Dr. Mills's counsel proceeded to file several procedural motions, which were heard at the original hearing on December 8, 1999. On December 21, 1999, the Board issued a written Decision and Order denying all of Dr. Mills's motions. On this same date, the Board granted Dr. Mills's request for a continuance to enable her counsel to engage in discovery.
Hearings on this matter reconvened on August 23, 2000 and continued through December 7, 2000. The dates of the hearings were as follows: August 23, 2000; September 21, 2000; October 5, 2000; October 19, 2000; and December 7, 2000. During the hearings, the Board received 28 exhibits, and heard testimony from six witnesses: the mother and father of female Patients A, B, C, and D; the mother and father of female Patients E and F; Dr. Eden, an expert in the field of pediatrics; and Dr. Mills. Dr. Mills did not present any witnesses to testify on her behalf.
On July 10, 2001, the hearing panel rendered its decision to suspend Dr. Mills's license indefinitely. The Board's decision provided that Dr. Mills can apply for reinstatement after she has undergone a physical and psychiatric examination by medical professionals pre-approved by the Board, and the reports from this examination indicate that she is fit for practice. On July 11, 2001, the Director of Health approved the Board's decision. Dr. Mills filed an administrative appeal of that decision on August 9, 2001, pursuant to R.I. Gen. Laws § 5-37-7. The appeal of that decision is now before this Court.
The facts of this case are organized in terms of the counts Appellant was charged with during the proceedings. On August 23, 2000, the Board heard testimony from the Appellant. On September 21, 2000, the Board heard testimony from the parents of Patients A, B, C, and D, and the Appellant. On October 5, 2000, the Board heard testimony from the parents of Patients E and F. On October 19, 2000, the Board heard testimony from the Appellant and Dr. Eden. On December 7, 2000, the last day of the hearings, the Board heard extensive testimony from the Appellant on direct examination. The pertinent testimony of each of the aforementioned witnesses is recounted in relation to the respective counts contained in the Amended Specification of Charges.
Count One
Count One charged Dr. Mills with unprofessional conduct, in violation of R.I. Gen. Laws §§ 5-37-5.1, 5-37-5.1(8) and 5-37-5.1(19), for submitting an application to the Rhode Island Hospital Credentials Committee in 1993 that contained false, erroneous, and misleading information regarding her credentials. The Board reviewed five exhibits relating to this charge, including the following: the report of the Rhode Island Hospital Credentials Committee regarding information provided to it by Dr. Mills (State's Exhibit 12); Dr. Mills's application for staff privileges to said hospital (State's Exhibit 10); letters of admission to both the Yale University (Yale) and Brown University (Brown) residency programs, provided by Dr. Mills in support of her application (State's Exhibits 8 and 9); and the record of Dr. Mills's hearing before the Rhode Island Hospital Credentials Committee (Exhibit 13). Additionally, the Board heard testimony from Dr. Mills relating to this charge.
Upon review of the aforementioned exhibits, the Board concluded that there were several discrepancies between the information Dr. Mills provided on her application for staff privileges to Rhode Island Hospital and her actual credentials. These inaccuracies were particularly apparent during Dr. Mills's hearing before the Credentials Committee. During the hearing, it was revealed that many of the credentials listed by Dr. Mills on her application were broad overstatements. Dr. Mills's application indicated that she was enrolled in a "Ph.D./MD" program at Case Western University, that she had been admitted to both the Yale and Brown medical residency programs, and that she voluntarily left her internships at St. Thomas Hospital and Winthrop University Hospital. Upon questioning by the Committee, Dr. Mills admitted that she had only attended medical school classes at Case Western University as part of her graduate pathology program and was never actually enrolled in their medical school. Upon further investigation by the Committee, it was also revealed that Dr. Mills was never actually admitted to the Yale and Brown residency programs, and that she was not offered a second year to continue her internships at St. Thomas Hospital and Winthrop University Hospital. The Board concluded that Dr. Mills's efforts during the hearings to clarify these discrepancies were "at best convoluted and inconsistent." (Administrative Board Decision at 4.) Furthermore, the Board found Dr. Mills's steadfast assertion of having voluntarily withdrawn her application from the Rhode Island Hospital Credentials Committee to be disturbing, when it was clear that the hospital denied her application for staff privileges. (Administrative Board Decision at 4.)
Count Two
Count Two charged Dr. Mills with unprofessional conduct, in violation of R.I. Gen. Laws §§ 5-37-5.1, 5-37-5.1(18), and 5-37-5.1(19), for her incompetent and negligent treatment of female Patients A, B, C, and D, her inappropriate communications with the parents of said patients, and her willful misconduct in the practice of medicine relating to this family. In relation to this charge, the Board heard testimony from the parents of Patients A, B, C, and D, Dr. Eden, an expert in the field of pediatrics, retained by the Board, and the Appellant herself. At the time proceedings began Patient A was 19 years of age, Patient B was 17 years of age, Patient C was 15 years of age, and Patient D was 5 years of age.
The mother of Patients A, B, C, and D (herein referred to as Witness One) testified that she began taking her daughters to see Dr. Mills, when her youngest daughter was born. (Tr. of September 21, 2000 at 5.) Witness One testified that during the time she was using Dr. Mills as the family pediatrician, Dr. Mills moved her office to four different locations. (Tr. of September 21, 2000 at 5-7.) Witness One further testified that at the third office location on Warwick Avenue, Dr. Mills treated Patients B and D outdoors. When Witness One arrived with Patients B and D for their scheduled appointments to get physicals, Dr. Mills was standing in the driveway and informed them that the office was contaminated. Witness One testified that Dr. Mills conducted the initial examination of Patients B and D on the front lawn towards the street and then requested that Witness One take Patient D inside for a urine sample. When Witness One returned with Patient D, the remainder of the physical was conducted on the front lawn. Witness One further stated that during this same visit, Dr. Mills asked Patient B whether she was sexually active, leaving Patient B mortified. According to Witness One, Dr. Mills proceeded to take blood samples from Patient B in her medical assistant's van, before deciding that it was too hot in the van, at which time Dr. Mills decided to take Patient D's blood outside on the grass. Witness One further testified that during this same visit, Dr. Mills pointed to an airplane flying over them and made a comment to the effect that the plane was dropping jet fuel.
Relating to this same charge, the father of Patients A, B, C and D, herein referred to as Witness Two, testified about his encounters with Dr. Mills. Witness Two stated that he personally brought his daughters to see Dr. Mills on approximately four occasions and was concerned by the frequency with which Dr. Mills was switching office locations. According to Witness Two, his concern regarding Dr. Mills's treatment of his daughters was heightened when he learned that Dr. Mills treated Patients B and D outdoors at the Warwick Office. (Tr. of September 21, 2000 at 61-63.)
Also providing testimony relating to this charge was Dr. Eden,[1] who stated that in the standard practice of medicine it would not be acceptable to practice medicine outdoors, noting that privacy and security are factors to be taken into consideration. (Tr. of October 19, 2000 at 35.) Dr. Eden explained that assuming there was a problem in a pediatrician's office building preventing its use, standard practice would require that the physician secure a private environment to protect the sanctity of the doctor/patient relationship. (Tr. of October 19, 2000 at 35.) According to Dr. Eden, barring a medical emergency, it would be more appropriate to cancel an examination than to conduct an examination outdoors. Dr. Eden clarified that in standard practice, a camp or school physical does not constitute a medical emergency. Additionally, Dr. Eden was firm in his testimony that conducting an examination in a car outside the physician's office stretched the bounds of propriety, barring an absolute medical emergency. Dr. Eden explained that such significant deviations from standard practice in the performance of medical examinations demonstrate inappropriate judgment, a sufficient reason for a pediatrician's disqualification. (Tr. of October 19, 2000 at 65.)
In response to these allegations, Dr. Mills testified about her treatment of Patients A, B, C, and D. Dr. Mills's testimony during the proceedings substantiates that she conducted an examination of Patients B and D outdoors because she believed her office to be contaminated. Dr. Mills did not dispute any of the facts relayed by Witness One regarding the outdoor examination of Patients B and D. Furthermore, Dr. Mills admitted that she sent Patient D inside the office for a urine sample when she herself would not enter the office because she believed the office contained deadly toxins. In totality, Dr. Mills's testimony relating to this charge revealed that all of the information relayed by the parents of Patients A, B, C, and D with respect to these patients' medical care were accurate.
Count Three
Count Three charged Dr. Mills with unprofessional conduct, in violation of R.I. Gen. Laws §§ 5-37-5.1, 5-37-5.1(18), and 5-37-5.1(19), for failing to maintain complete and accurate records for Patients A, B, C, and D, and for reporting false, misleading, and irrelevant information on said records. Witness One and Witness Two, as well as the Appellant, provided testimony in relation to this charge.
During the hearings, Witness One testified that all of her daughters' previous medical records from other doctors and hospitals were provided to Dr. Mills when they took her on as the family pediatrician. (Tr. of September 21, 2000 at 25.) She testified that the records were complete when they were provided to Dr. Mills and a yellow shot card was now missing from the records. (Tr. of September 21, 2000 at 26.) Witness One also explained that Patient A's apnea records, which were transported to Dr. Mills, were now missing. (Tr. of September 21, 2000 at 27.) Also testifying in relation to this charge, Witness Two stated that Patient A's chart includes an inaccurate notation that reads that he was too busy to take Patient A for an MRI after she was injured on a roller coaster. According to Witness Two, he never made any such comment to the Appellant. (Tr. of September 21, 2000 at 72.)
The Board also heard testimony from the Appellant in relation to this charge. During her testimony, Dr. Mills admitted to placing information in the aforementioned patients' records that did not directly concern their medical treatment. Dr. Mills testified that she included, in these patients' summary sheets, Witness One's statements that she did not smell toxins in the Appellant's office building. At the same time, the Appellant conceded that these summary sheets are intended to be devoted to the most important information regarding the patient's medical history.
Count Four
Count Four charged Dr. Mills with unprofessional conduct, in violation of R.I. Gen. Laws §§ 5-37-5.1, 5-37-5.1(8), 5-37-5.1(18), and5-37-5.1(19), for anonymously making an unfounded telephone complaint to the Department of Children, Youth and Their Families (DCYF) suggesting child abuse by the parents of Patients A, B, C, and D. The Board further maintained that this complaint was made as a retaliatory measure, because the parents had filed a complaint against Dr. Mills with the Department of Health. The Board heard testimony from the mother and father of Patients A, B, C, and D, Dr. Eden, and the Appellant, relating to this charge.
The mother of Patients A, B, C, and D testified that she contacted the Department of Health concerning the Appellant, after receiving a phone call in which the Appellant seemed suicidal. (Tr. of September 21, 2000 at 12.) During this conversation, the Appellant told Witness One that everyone, but namely the Department of Health and Blue Cross, were all out to get her. Witness One stated that after she sent a letter to the Department of Health regarding the Appellant's behavior, the Appellant began calling her family at their home, demanding to speak with either her or her husband. On one occasion, the Appellant called back at midnight to speak with Witness One's husband and during that conversation asked why they were doing this to her. (Tr. of September 21, 2000 at 15.) According to Witness One, subsequent to this conversation, the family received repeated telephone calls and hang ups, one of which Patient B directly traced back to Appellant by dialing star 69. (Tr. of September 21, 2000 at 15-17.)
Witness Two's testimony outlined the full extent of retaliatory measures taken by Dr. Mills. Witness Two, who is employed as a case worker for DCYF, testified that Dr. Mills filed a complaint against him with DCYF claiming that she suspected abuse. According to Witness Two, he was called into his supervisor's office and was informed that an anonymous call had been made to the Child Abuse Hot Line in regard to suspicious injuries on Patients A and B. He further testified that the only person he could fathom making such a complaint was Dr. Mills. He explained to his supervisor that he had filed a complaint against Dr. Mills and suspected that it was she who made the call. On account of this information, Witness Two explained that DCYF conducted a non-investigation, downgraded to an early warning. (Tr. of September 21, 2000 at 64.) Witness Two testified, however, that though a non-investigation was considered more appropriate given the unusual circumstances, both the supervisor and the chief investigator were involved and asked Witness Two questions regarding potential abuse. (Tr. of September 21, 2000 at 66.)
In relation to this charge, Dr. Eden testified that there was nothing in the medical history of Patients A and B that would have led him to suspect child abuse. According to Dr. Eden, a physician who is referred a medical chart from another physician has a duty to review that chart and consult the previous physician if he has any concerns about the care and treatment of that patient. (Tr. of October 19, 2000 at 29.) In cases where a pediatrician might suspect child abuse, Dr. Eden explained that the pediatrician would have a duty to consult the patient's record thoroughly and contact past treating physicians and past treating hospitals before contacting the appropriate agency. (Tr. of October 19, 2000 at 30-31.) Dr. Eden further clarified that the information provided in the records that Witness One brought to Dr. Mills regarding Patient A's past medical history would have given a pediatrician sufficient notice that the child had a near Sudden Infant Death Syndrome (SIDS) event in her life. (Tr. of October 19, 2000 at 34.) Furthermore, Dr. Eden explained that if a pediatrician does suspect child abuse, neglect or sexual abuse, the pediatrician is required to report that suspicion to DCYF or the appropriate agency and then follow that up with a written physician's record of examination. (Tr. of October 19, 2000 at 40.) Dr. Eden testified that it is not in accordance with the appropriate standard of care for a physician to call an anonymous hotline regarding suspicions of child abuse. (Tr. of October 19, 2000 at 41.)
During Dr. Mills's testimony on this issue, Dr. Mills conceded that she called the Child Abuse Hot Line regarding Witness Two, who she was aware worked for DCYF. (Tr. of August 23, 2000 at 74.) Dr. Mills stated that she made this phone call on October 5, 1999, only after she had learned that Witness One and Witness Two had filed a complaint against her with the Department of Health. (Tr. of August 23, 2000 at 75.) Dr. Mills further admitted that the patient she was calling the Hot Line in regard to was 19 years of age at the time and had already started college. (Tr. of August 23, 2000 at 76.) Dr. Mills explained that the possibility of abuse came to her attention when she was carefully reviewing the records of Patients A, B, C, and D so she could respond to the claim that Witness One and Witness Two had filed against her. (Tr. of August 23, 2000 at 75.) According to Dr. Mills, she was particularly disturbed that Witness One had never mentioned that Patient A was a near SIDS baby; yet, had mentioned that Patient A had apnea. (Tr. of August 23, 2000 at 75.) Dr. Mills explained that this was worrisome because SIDS is more commonly known than apnea. (Tr. of August 23, 2000 at 75.) Furthermore, Dr. Mills claimed that when she thoroughly looked through the medical records of Patient A, provided by Witness One, she noticed numerous injuries from haphazard incidents which led her to believe that there was abuse occurring. (Tr. of October 19, 2000 at 20.) Dr. Mills later testified that she made the complaint to DCYF because she was concerned about Patients A, B, C, and D after seeing a Dateline show in which a girl was murdered by her father. (Tr. of December 7, 2000 at 57.) According to Dr. Mills, she feared that if she identified herself when making the report, she would be suspended. (Tr. of December 7, 2000 at 66.)
Count Five
Count Five charged Dr. Mills with unprofessional conduct in violation of R.I. Gen. Laws §§ 5-37-5.1, 5-37-5.1(18), and 5-37-5.1(19), by reason of professional incompetency, in committing acts of misconduct due to an impairment that has directly affected her ability to practice professionally. As this charge is more general in nature, all of the testimony throughout the proceedings is relevant.
During the hearings, both Witness One and Witness Two expressed concern for the Appellant and explained to the Board that their reason for filing a complaint with the Department of Health was that they were worried that the Appellant might harm herself. Both sets of parents who testified during the proceedings, explained that they had filed complaints against the Appellant with the Department of Health after making the decision to switch to new pediatricians. Furthermore, during the proceedings, Dr. Eden testified that in his expert opinion, he did not believe that the Appellant was fit to practice medicine at the current time.
In addition to the testimony of the State's witnesses, a large basis for the Board's determination relating to this charge stems from the Appellant's own testimony during the proceedings. During her testimony, Dr. Mills admitted that she moved four times during her time in private practice, which lasted from 1994 until 1999. She explained that the reason for each of these moves was contamination in the buildings where her various offices were located. (Tr. of December 7, 2000 at 9-19.) According to Dr. Mills, her first office, located on Jefferson Boulevard, was contaminated by the carpeting and glue used in the office. Dr. Mills went on to explain that although her second office building, located at Reservoir Avenue, was not initially contaminated, it became contaminated after she moved her things over from the first building to the second building. Moreover, she testified that along with her furniture, medical equipment, papers and books, her patients' charts became contaminated. Though Dr. Mills claimed that such contamination could be verified through tests conducted by 3-M Corporation, Dr. Mills never provided the results of such tests during the proceedings, even after being asked to do so. Dr. Mills further testified that she was never informed by DEM or the real estate agent that there had been a gasoline spill under the third office building. Finally, Dr. Mills attributed the contamination in the fourth building to toxic levels of formaldehyde. (Tr. of December 7, 2000 at 29-30.)
In explaining how she confronted these situations, Dr. Mills testified that she informed most of her patients about the contaminants in the various office buildings, and as soon as she became aware that there were toxins in a building, she would begin doing house calls. (Tr. of December 7, 2000 at 38.) Dr. Mills further explained that on one occasion, she examined a patient in the parking lot of St. Joseph's Hospital after St. Joseph's Hospital refused to allow her to examine the patient in the Emergency Room of the hospital. During the proceedings, Dr. Mills also felt it was important to clarify that this examination took place in the back of the patient's car. (Tr. of December 7, 2000 at 39-40.) Dr. Mills further admitted that due to the toxins in her offices, she began to conduct some of her examinations outdoors and confirmed that she gave her patients the chicken pox vaccine outdoors in the back of her office building, where according to Dr. Mills, it was private. (Tr. of December 7, 2000 at 54-55.) Dr. Mills did not dispute the fact that she allowed her medical assistant and young patients to go in and out of her office, when she herself would not enter the office building because she believed it contained deadly toxins. (Tr. of December 7, 2000 at 44-45.) Dr. Mills explained that she would wait outside while her patients went inside the office attended by Dr. Mills's medical assistant, so the patients could be weighed, measured, and have their temperatures and vital signs taken. (Tr. of December 7, 2000 at 45-46.)
With respect to submitting to a psychiatric examination, as required by the Investigating Committee, the Appellant testified that she did not care for the psychiatrist chosen by the State and decided to choose her own psychiatrist to conduct an evaluation. The Appellant proceeded to explain that the psychiatrist she had chosen did not complete the evaluation because they could not get along.
Count Six
Count Six charged Dr. Mills with unprofessional conduct, in violation of R.I. Gen. Laws §§ 5-37-5.1, 5-37-5.1(19), 5-37-5.1(24), and5-37-22 and the Rules and Regulations of the Board of Licensure and Discipline regarding medical records § 11.2, for her incompetent and negligent care of Patients E and F. In relation to this charge, the Board heard testimony from the parents of Patients E and F, Dr. Eden, and Dr. Mills.
The mother of Patients E and F (herein referred to as Witness Three) testified that she first became concerned about Dr. Mills's conduct when she noticed Dr. Mills's aggressive behavior toward Patient E. Witness Three explained that Dr. Mills became irritated when Patient E exhibited agitation about receiving injections and that Dr. Mills would request that Witness Three hold her daughter down. Additionally, Witness Three testified that Dr. Mills used an aggressive tone with Patient E. Witness Three also testified as to how uncomfortable it was for her to bring Patient E for shots due to the tense environment it created and explained that she has not incurred similar problems since she switched pediatricians. (Tr. of October 5, 2000 at 6-7.)
Regarding the care of Patient F, Witness Three testified that Dr. Mills informed her that Patient F was not growing at the standard rate and made statements to the effect that Patient F could potentially turn out to be a dwarf. Witness Three testified that Dr. Mills showed her pictures of dwarfs and commented that dwarfs have a life span of approximately 20 years. According to Witness Three, Dr. Mills went through a thorough explanation of dwarfism, showed Witness Three a medical book stating the symptoms and signs of the disease, and went on to tell Witness Three that Patient F exhibited dwarf like features, and may be suffering from a condition known as Williams Syndrome. Dr. Mills also used the descriptive terms, "elf" and "midget," in referring to this patient. Although there was some confusion during the proceedings as to which of these words was used at which time, the record reveals that Dr. Mills used these terms in reference to Patient F. Based on Dr. Mills's findings, Witness Three testified that Dr. Mills ordered related tests, consisting of a heart exam and x-rays. Witness Three further testified that when she brought Patient F for the heart exam, that doctor told Witness Three that there was no need for such extensive tests. Witness Three further explained that despite these findings, Dr. Mills wanted to conduct additional tests because of Patient F's small size. The results of all tests done on Patient F proved negative. (Tr. of October 5, 2000 at 30.)
In addition to finding the above stated treatment of Patients E and F to be inferior, Witness Three's testimony also revealed that she was taken aback by Dr. Mills's lack of attentiveness in ensuring that she was able to care for Patients E and F on a regular basis. According to Witness Three, between 50 to 60 percent of the time Patients E and F needed to see Dr. Mills on an emergency basis, they were transferred to another doctor. (Tr. of October 5, 2000 at 14.) Witness Three further stated that she was given a beeper number to use for emergencies which she was afraid to use because Dr. Mills appeared very irritated when she was called on her beeper. (Tr. of October 5, 2000 at 27.)
As a result of the difficulties which they were experiencing in using Dr. Mills as the family pediatrician, Witness Three testified that she and her husband decided that it would be best if they chose a new pediatrician. Upon making this decision, Witness Three stated that they informed Dr. Mills that they would need her to transfer the medical records of Patients E and F. Witness Three testified that Dr. Mills refused to send said records to the new pediatrician until Witness Three and her husband paid certain co-pays she claimed were outstanding. (Tr. of October 5, 2000 at 12.) Witness Three further explained that neither she nor her husband understood how Dr. Mills arrived at the total amount allegedly owed, and there was no clarification on this issue.
The father of Patients E and F (herein referred to as Witness Four) corroborated his wife's testimony, explaining that after he and his wife decided to switch to a new pediatrician, he went to the Appellant's office to sign a release for the transfer of medical records. (Tr. of October 5, 2000 at 44.) Witness Four testified that Dr. Mills informed him that she would like Witness Four and his wife to pay her bill before she transferred the medical records of Patients E and F. Moreover, Witness Four stated that Dr. Mills informed him that in addition to the co-pays, he and his wife would have to pay for the transfer of medical records. (Tr. of October 5, 2000 at 52). Witness Four responded that they would not pay the bill until Dr. Mills accounted for the amounts listed, at which time, Dr. Mills agreed to transfer the records and give an accounting of the amounts allegedly owed. Witness Four explained, however, that the records promised were not transferred until after he contacted the Department of Health a couple of weeks later. (Tr. of October 5, 2000 at 46.)
In addition to the testimony of Witnesses Three and Four regarding Dr. Mills's care of Patients E and F, the Board heard extensive testimony from Dr. Eden on this subject. In regards to Dr. Mills's treatment of Patient E, Dr. Eden testified that it is not customary practice for a pediatrician to act aggressively when pediatric patients express agitation about receiving injections. With respect to Dr. Mills's care for Patient F, Dr. Eden testified that there was nothing in Patient F's chart that would lead him to conclude that Patient F would be a midget, an elf, or a dwarf. Dr. Eden further explained that though Patient F was short, she was proportional for her weight and he would characterize her growth as normal. (Tr. of October 19, 2000 at 36.) Though Dr. Eden conceded that Patient F was only in the fifth percentile in terms of weight and that a doctor would want to monitor the child's growth given such facts, he stated that it would not be cause for alarm. (Tr. of October 19, 2000 at 67.) Furthermore, Dr. Eden explained that although the cardiologist did find a slight heart murmur in Patient F, absent a failure to thrive, Dr. Mills had no basis for her suspicions that Patient F suffered from a disease known as William's Syndrome. (Tr. of October 19, 2000 at 74.) In regard to the transferring of medical records, Dr. Eden testified that in his opinion it would violate the standard of care for a doctor to withhold a medical record for an unpaid balance. (Tr. of October 19, 2000 at 28).
Count Seven
Count Seven charged Dr. Mills with unprofessional conduct, in violation of R.I. Gen. Laws § 5-37-5.1, for the acts referred to in the Summary Suspension of October 19, 1999, and for the collective and cumulative impact of the aforementioned acts of misconduct. This charge relates to all of the testimony throughout these proceedings, paraphrased in the discussion of the preceding counts. Based on the cumulative weight of the evidence presented throughout the proceedings, the Board concluded that the Appellant is presently unfit to practice medicine.
II. Standard of Review
The Court's review of a decision by the Department of Health is controlled by R.I. Gen. Laws 1956 § 42-35-15(g), which provides for review of a contested agency decision:
 (g) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error or law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
This section precludes a reviewing court from substituting its judgment for that of the agency in regard to the credibility of the witnesses or the weight of the evidence concerning questions of fact. Costa v.Registry of Motor Vehicles, 543 A.2d 1307, 1309 (R.I. 1988); Carmody v.R.I. Conflict of Interest Commission, 509 A.2d 453 (R.I. 1986). This is true even in cases where the court, after reviewing the certified record and evidence, might be inclined to view the evidence differently from that of the agency. Berberian v. Dept. of Employment Security, 414 A.2d 480
(R.I. 1980). This Court will "reverse factual conclusions of administrative agencies only when they are totally devoid of competent evidentiary support in the record." Milardo v. Coastal ResourcesManagement Council, 434 A.2d 266, 272 (R.I. 1981). Questions of law, however, are not binding upon a reviewing court and may be freely reviewed to determine what the law is and its applicability to the facts. Carmody v. R.I. Conflicts of Interests Commission, 509 A.2d at 458. The Superior Court's role is to examine whether any competent evidence exists in the record to support the agency's findings. Rocha v.Public Util. Comm'n, 694 A.2d 722, 727 (R.I. 1997). The Superior Court is required to uphold the agency's findings and conclusions if they are supported by competent evidence. Rhode Island Public TelecommunicationsAuthority, et al. v. Rhode Island Labor Relations Board, et al.,650 A.2d 479, 485 (R.I. 1994).
Substantial Evidence
Appellant argues that this Court should reverse the Board's decision because the Board's findings are not supported by the substantial weight of the evidence. Specifically, the Appellant contends that the evidence presented during the hearings do not support the Board's conclusions regarding (1) the anonymous complaint Appellant made to DCYF; (2) Appellant's concerns regarding Witness One's failure to mention that Patient A suffered from a near SIDS episode; (3) Appellant's treatment of patients outdoors; (4) Appellant's differential diagnosis that Patient F might suffer from William's Syndrome; (5) Appellant's willingness to transfer the medical records of Patients E and F; (6) Appellant's willingness to undergo an evaluation; (7) Appellant's Rhode Island Hospital Application; and (8) the issue of whether Appellant suffered from a mental impairment. The Board argues that under the fair preponderance standard, the Board had substantial evidence to find unprofessional conduct on the part of the Appellant for each of the seven counts. This Court addresses each of the Appellant's arguments below.
DCYF COMPLAINT
Appellant argues that the testimony presented during the hearings demonstrates that the Appellant had legitimate concerns in filing a complaint with DCYF, against the parents of Patients A, B, C, and D. Moreover, Appellant contends that the Board's findings are inconsistent with the applicable child abuse reporting statutes, which specifically provide for hot line reports. In reviewing the Board's decision, this Court finds that substantial evidence of record existed in the form of witness testimony for the Board to conclude that the Appellant's complaint to DCYF constituted unprofessional conduct.
Though the Appellant contests the Board's determinations with regard to the credibility of the State's witnesses, it is not for this Court to substitute its judgment for that of the agency regarding the credibility of witnesses or the weight of the evidence with respect to questions of fact. Tierney et al. v. The Department of Human Services, 793 A.2d 210
(R.I. 2002). As with other witnesses, where evaluation of an expert's testimony implicates determinations of credibility, the Court should defer to the agency's determinations. See Environmental Scientific Corp.v. Durfee, 621 A.2d 200, 206-07 (R.I. 1993). The Board heard testimony from Witness One and Witness Two, both of whom the Board found to be credible, that the Appellant began calling their home and harassing them after they filed a complaint against the Appellant with the Department of Health. Each of these witnesses testified that Appellant had never expressed any concern that abuse might be occurring in their home and that there was no foundation for such concerns. The Appellant herself admitted that she placed an anonymous call with the Child Abuse Hot Line regarding Witness Two. The Board also found convincing the testimony of Dr. Eden, an expert in the field of pediatrics, who stated that based on the records of Patients A, B, C, and D, there was no reason for the Appellant to suspect that abuse was occurring.
Furthermore, Dr. Eden testified that if a pediatrician did suspect child abuse, it would not be in accordance with the standard practice to place an anonymous call. He explained that standard practice requires a physician to state their name and follow the phone call up with a written report.
Moreover, the Appellant's handling of the complaint was in direct contravention of the law. The statute that governs reports by physicians who suspect abuse or neglect is R.I. Gen. Laws § 40-11-6. The statute reads:
 "(a) When any physician or duly certified registered nurse practitioner has cause to suspect that a child brought to him or her for examination, care, or treatment, is an abused or neglected child as defined in this chapter, or when he or she determines that a child under the age of twelve (12) years is suffering from any sexually transmitted disease, he or she shall report the incident or cause a report thereof to be made to the department as provided in subsection (b).
 (b) An immediate oral report shall be made by telephone or otherwise, to both the department and law enforcement agency and shall be followed by a report in writing to the department and law enforcement agency explaining the extent and nature of the abuse or neglect the child is alleged to have suffered.
 (c) The department, upon receipt of such a report by a person other than physician or duly certified registered nurse practitioner alleging that a child has been physically abuse, shall investigate the report, and if the investigation reveals evidence of physical or sexual abuse, the department shall have the child examined by a licensed physician or duly certified registered nurse practitioner. Any child protective investigator shall, with or without the consent of the parent or other person responsible for the child's welfare, have the right to remove the child from the place where the child may be to secure the examination required by this subsection. Upon completion of the examination, it shall be mandatory for the physician or duly certified registered nurse practitioner to make a written report of his or her findings to the department."
In addressing questions of statutory interpretation, the Supreme Court of Rhode Island had held that the Court "must literally interpret a clear and unambiguous statute and attribute the plain and ordinary meaning to its words." Arnold in his capacity as Director, Rhode Island Departmentof Labor and Training v. Rhode Island Department of Labor and TrainingBoard of Review and Gail Adler et al., 822 A.2d 164, 168 (R.I. 2003) (citing Solas v. Emergency Hiring Council of Rhode Island, 774 A.2d 820, 824 (R.I. 2001)). The above statute unambiguously distinguishes between the duty of physicians, as compared to the duty of ordinary citizens in filing complaints regarding abuse. It is clear that a physician has a higher duty when reporting a case of suspected child abuse. Thus, this Court finds that there was substantial evidence in the record to support the Board's finding that the complaint made by Appellant constituted unprofessional conduct.
Treatment Outdoors
Appellant argues that the Board erred in finding that Appellant's decision to treat her patients outdoors constituted unprofessional conduct. Appellant maintains that such outdoor treatments were necessary because of problems in the various office buildings where she decided to locate her offices. Furthermore, Appellant asserts that based on Dr. Eden's testimony during the hearings, outdoor examinations may not be a reason to disqualify someone from practicing medicine and outdoor exams are permissible in cases of emergency. In view of all the testimony presented during the hearings, this Court finds substantial evidence in support of the Board's finding that Appellant's outdoor treatment of patients constituted unprofessional conduct.
"Judicial scrutiny on appeal `is limited to a search of the record to determine if there is any competent evidence upon which the agency decision rests. If there is any such evidence, the decision will stand.'"Edmund A. Restivo, Jr., in His Capacity as General Partner of SunnybrookAssociates v. Gerald R. Lynch et al., 707 A.2d 663, 665 (R.I. 1998) (quoting E. Grossman Sons, Inc. v. Rocha, 118 R.I. 276, 285-86,373 A.2d 496, 501 (R.I. 1977)). This Court finds substantial evidence on the record to support the Board's finding that Appellant's treatment of patients outdoors constituted unprofessional conduct, including the testimony of an expert witness who explicitly stated that the Appellant's use of outdoor treatment was not within the parameters of professional conduct. Under § 5-37-5.1(19) unprofessional conduct includes:
 "Incompetent, negligent, or willful misconduct in the practice of medicine which includes the rendering of medically unnecessary services, and any departure from, or the failure to conform to, the minimal standards of acceptable and prevailing medical practice in his or her area of expertise as is determined by the board. The board need not establish actual injury to the patient in order to adjudge a physician or limited registrant guilty of the unacceptable medical practice in this subdivision."
It is well established that this Court effectuates the Legislature's intent "by examining a statute in its entirety and giving the words their plain and ordinary meaning." Parkway Towers Associates v. Richard H.Godfrey, Jr., in His Capacity as Executive Director of the Rhode IslandHousing and Mortgage Finance Corporation, 688 A.2d 1289, 1294 (R.I. 1997) (quoting In re Falstaff Brewing Corp., 637 A.2d 1047, 1049 (R.I. 1994)). This Court's primary objective in applying a statute is to ensure that its enforcement is consistent with the statute's underlying purpose.Kirby v. Planning Board of Review of the Town of Middletown, 634 A.2d 285, 290 (R.I. 1993) (citing Zannelli v. Di Sandri, 121 A.2d 652, 655 (R.I. 1956)).
While the Rhode Island Supreme Court has not specifically addressed the extent of the Board's authority in determining what constitutes inappropriate conduct, other jurisdictions have found that a Board of Medicine and licensees possess sufficient understanding in the field of medicine to make such determinations. The Court of Appeals of Michigan has held that a statutory provision, which prohibits departure from minimal standards of practice is "sufficiently certain and definite" based on "well recognized meanings" to afford a licensee fair notice as to what type of conduct is unacceptable in the field of medicine. SeeJoseph W. Rucker, M.D. v. Michigan Board of Medicine, 360 N.W.2d 154
(Mich. App. 1984). "It is therefore, proper for the Board of Medicine, having education and experience, to determine whether petitioner's actions constituted a violation of minimal standards." Id. (citingSanchick v. State Board of Optometry, 70 N.W.2d 757 (1955); Warchuis v.State Bd. of Registration in Medicine, 281 NW 410 (1938)). Adopting this same reasoning, the Supreme Court of Arkansas has held that certain behavior is so obviously unprofessional that it not needs to be explicitly spelled out in a statute in order for a Board of Medicine to deem that it warrants a severe sanction. Thus, in Arkansas State MedicalBoard v. John Q. Elliot, M.D., 563 S.W.2d 427 (Ark. 1978), the Supreme Court of Arkansas held that suspension of the appellant's license was appropriate where the appellant gave two prescriptions to the same man under two different names who admittedly had nothing wrong with him. That there was no law expressly proscribing such conduct could not excuse such sub par behavior on the part of a practicing physician. See id.
In the present case, there was substantial evidence in the record to confirm the Board's finding that Appellant's outdoor treatment of her patients was not in accordance with the minimal standards of acceptable and prevailing medical practice. Appellant herself admitted that on one occasion, she treated a child in a parking lot inside the patient's car, and other times, she would treat the children outside in the backyard. She also conceded that she administered the chicken pox vaccine in the yard and that she drew blood from patients B and D outdoors. According to Dr. Eden, the outdoor treatment Appellant engaged in was not justified, regardless of the alleged contamination in the Appellant's office buildings. He explained that while contamination in the offices would have necessitated alternative venues for the examinations, such outdoor examinations were inconsistent with the appropriate standard of care. Furthermore, the Board did not believe that every building owned by Appellant was contaminated as suggested in her testimony. Appellant failed to present any evidence during the hearings to substantiate her claims that each of her office buildings that she inhabited was contaminated. Additionally, Appellant made admissions to the effect that she permitted her medical assistant to go in and out of the allegedly contaminated buildings while she waited outside. Appellant also testified that everything, including patients' medical records, had become contaminated. Yet at the same time, admitted that she placed these same records in her parents' home and would have her medical assistant retrieve them when they were needed. Based on the aforementioned evidence, this Court concludes that there was substantial evidence in support of the Board's determination that Appellant's outdoor treatment constituted unprofessional conduct.
Williams Syndrome
Appellant next argues that the evidence presented during the proceedings demonstrates that Appellant's differential diagnosis that Patient F might suffer from "Williams Syndrome" was not unfounded. Appellant asserts that the Board's conclusion that later examination revealed nothing wrong with Patient F is contrary to the evidence that the Board heard. In light of the cumulative testimony presented during the hearings, this Court finds that there was substantial evidence supporting the Board's finding that the Appellant's medical treatment of Patient F constituted unprofessional conduct.
Under § 5-37-5.1(19), discussed in the preceding section, the incompetent or negligent practice of medicine is sufficient for the Board to find that a physician has committed unprofessional conduct. During the proceedings, the Board heard Dr. Eden testify that a competent physician would not have suspected that Patient F had Williams Syndrome. Furthermore, according to Witness Three, whom the Board found to be credible, when Witness Three took Patient F for a heart exam, the doctor said that there was no reason for additional tests to be conducted. Though Appellant claims her medical diagnosis was appropriate, Appellant failed to present any experts to confirm her assertions that her medical treatment of Patient F was reasonable.
While our Supreme Court has not directly addressed the degree of discretion a medical board ought to be afforded when making a decision regarding the adequacy of a physician's care, this issue has been addressed by other courts. Other jurisdictions have concluded that a board, which has the benefit of expert testimony in reaching its decision, should be afforded a great deal of deference in its determinations as to what constitutes an extreme departure from the ordinary standard of care. See Livingston, M.D. v. Arkansas State MedicalBoard, 701 S.W.2d 361 (Ark. 1986). Thus, in Livingston M.D. v. ArkansasState Medical Board, the Supreme Court of Arkansas affirmed suspension of the appellant's license, where the appellant negligently led a patient to believe that she was pregnant for a period of four months. Though the appellant in that case offered expert testimony to the effect that the appellant's records demonstrated an adequate standard of care, the Court concluded that a physician's conduct does not have to rise to the level of malpractice for it to constitute unprofessional conduct warranting suspension of a license. See id. Similarly, in the present case, this Court finds that there was substantial evidence in the record to support the Board's conclusion that Appellant's treatment of Patient F did not conform to the ordinary standard of care and warranted a sanction that the Board deemed appropriate.
Record Transfer Issue
Next, Appellant argues that the Board's finding that Appellant refused to transfer records "until all fees were paid for services rendered" is clearly erroneous in light of the substantial weight of the evidence. The Appellant fervently denies wrongfully withholding Patients E's and F's records despite the testimony of Patients E's and F's parents that the Appellant made the payment of a disputed bill a condition precedent to sending said records. Upon review of the Board's decision, this Court finds that there was substantial evidence on the record to support the Board's finding that the Appellant acted unprofessionally in failing to transfer patients' records to a new pediatrician in a timely manner.
As stated above, this Court will not substitute its judgment for that of the Board with respect to the credibility of witnesses. See Tierney,et al., 793 A.2d 210, 213 (R.I. 2002). Thus, no new determinations will be made here as to the credibility of the parents of Patients E and F, where the Board has already found these witnesses to be credible. Seeid. As such, this Court is confined to making a determination solely on the basis of whether there was competent evidence on the record to support the Board's finding that the Appellant acted unprofessionally in her transferring of patients' records. See id. at 212.
With respect to this issue, the parents of Patients E and F, both of whom the Board found to be credible, each testified that the Appellant refused to transfer their daughters' medical records until they paid the bill Appellant claimed they owed. In reviewing copies of the Appellant's billings to the family, the record reveals that the services rendered and amounts shown as due on the bills were incomprehensible to the Board. Appellant's refusal to transfer records until the parents of Patients E and F paid the amount shown on bill was substantiated by the fact that Appellant did not turn over the patients' records until the Department of Health intervened. Thus, this Court finds substantial evidence in the record for the Board's finding that Appellant acted unprofessionally in the transferring of patients' records.
Evaluation Issue
Appellant argues that she is willing to be examined by a psychiatrist, but not one who is subject to the Board's control. Appellant asserts that she has been examined by another psychiatrist and it has been determined that she suffers from no mental impairment. Therefore, there is no reason why she should not be permitted to practice medicine. This Court finds substantial evidence on the record to support the Board's finding that the Appellant had not cooperated with the Board's order that Appellant submit to a psychiatric examination in accordance with the conditions provided by the Board.
Pursuant to § 5-37-5.2(e)(2), the Investigating Committee of the Board may exercise the authority afforded by § 5-37-1.3(10) to assist the Board, if the Investigating Committee determines that the licensee is suffering from an impairment. The Investigating Committee was enlisted by the Director of Health to investigate the Appellant's behavior after a complaint was filed against the Appellant in 1998. After conducting a review of the Appellant, which included interviewing the Appellant and potential witnesses, the Committee felt it appropriate for Appellant to submit to a psychiatric examination. Based on the evidence presented, the Board concluded that the Appellant had not as of yet submitted to an evaluation. During Court hearings, the Appellant expressed reluctance to submit to an examination by a psychiatrist pre-approved by the Board as opposed to one of her own choosing. Thus, this Court finds that there is substantial evidence in support of the Board's finding that the Appellant did not comply with its order.
Rhode Island Hospital Application
Appellant argues that her Rhode Island Hospital application did not contain false information and asserts that her usage of the word "acceptance" in relation to Yale and Brown was in relation to her acceptance as a match candidate for those programs. Appellant further contends that her reference to her two years of medical school at Case Western University was not a misrepresentation because she accurately stated her role as a Ph. D candidate (registered but not matriculated in the medical school), accurately identified the school where she earned her medical degree, and identified all her residencies and internships. This Court finds that substantial evidence existed in the form of testimony and exhibits to conclude that the Appellant committed unprofessional conduct in the submission of her Rhode Island Hospital application.
As the Board reviewed Appellant's application for staff privileges and the information obtained from the Rhode Island Hospital Staff Credentials Committee, this Court must give deference to the Board, as the trier of fact, in finding that the Appellant made several misrepresentations in her efforts to obtain staff privileges. See Rhode Island PublicTelecommunications Authority, et al. v. Rhode Island Labor RelationsBoard, et al., 650 A.2d 479, 485 (R.I. 1994). Based on the Board's thorough evaluation of the exhibits regarding this matter, this Court finds that there was substantial evidence to support the Board's finding that Appellant "provided false information to the Rhode Island Hospital Credentials Committee in an effort to gain staff privileges at the hospital." (Administrative Board Decision at 4.) The Board found that the Appellant made several misrepresentations on her application, including her affiliation with Case Western University Medical School, her admission to the Yale and Brown residency programs, and her alleged voluntary departure from two different internships. This Court finds that there was competent evidence to justify the Board's findings on this charge.
III. Adequacy of Evidence
Next, Appellant asserts that certain testimony permitted in the hearings constituted hearsay that unfairly biased the proceedings. One particular example that Appellant focuses on is Witness One's testimony that when Patient B dialed star 69 after a hang-up, Appellant answered. Based on the rules governing administrative hearings and the nature of the hearsay evidence, this Court finds that the Board's admittance of hearsay evidence during the hearings did not unfairly bias the proceedings.
This Court has consistently acknowledged that the parameters for admitting relevant evidence in administrative proceedings are broad in scope. "Administrative hearings are not held to the same evidentiary standards as criminal or even judicial civil proceedings. Hearsay is quite acceptable in administrative hearings." In re Joseph A. Cross,617 A.2d 97, 102 (R.I. 1992) (quoting Craig v. Pare, 497 A.2d 316, 320 (R.I. 1985)) Thus, in In re Joseph A. Cross, the Supreme Court held that admission of a complaint letter against appellant in an administrative hearing was permissible because hearsay doctrines were not applicable. See id. Similarly, in the present case, traditional hearsay rules were not applicable and the hearsay evidence in question was clearly relevant to the proceedings. Consequently, this Court finds that the Board's decision to permit such hearsay testimony did not prejudice the Appellant's right to a fair and unbiased proceeding.
IV. Arbitrary and Capricious
Next, Appellant argues that in light of the evidence presented, the Board's decision is arbitrary and capricious. Appellant contends that the testimony of the State's witnesses directly contradict the Board's findings. In support of her argument, Appellant makes reference to certain statements by the State's witnesses during their testimony, and claims that they pose inconsistencies in the Board's case against her. Upon a thorough review of the Board's decision, this Court finds that the Board's determination that Appellant was guilty of unprofessional conduct in the practice of medicine was not arbitrary and capricious.
The Supreme Court of Rhode Island has repeatedly declared that the arbitrary and capricious standard of review is limited in scope and affords great deference to agency decisions. "Use of the arbitrary and capricious standard means that reviewing courts will uphold administrative decisions . . . as long as the administrative interpreters have acted within their authority to make such decisions and their decisions were rational, logical, and supported by substantial evidence."Domingo Gonclaves v. NMU Pension Trust, 818 A.2d 678, 682-83 (R.I. 2003) (citing Doyle v. Paul Revere Life Insurance Co., 144 F.3d 181, 184 (1st Cir. 1998)). See also Evan J. Connor v. Paul Bjorklund, et al., No. 2002-720-A., slip op. at 5 (R.I., filed October 31, 2003) (here in a civil action, the Rhode Island Supreme Court refused "to second-guess the trial justice's credibility findings" where the defendants cited "certain discrepancies between plaintiff's trial testimony and other evidence contained in the record").
In applying the arbitrary and capricious standard to the present case, this Court recognizes that under R.I. Gen. Laws § 5-37-5.1, the Board of Medical Licensure and Discipline is afforded wide discretion in making determinations as to what constitutes unprofessional conduct. The statute specifically reads that unprofessional conduct is not limited to the thirty one items specifically laid out in the statute and provides that the items mentioned "may be further defined by regulations established by board with the prior approval of the director." R.I. Gen. Laws §5-37-5.1. In the case at bar, the Board heard from several witnesses including the mother and father of patients A, B, C, and D; the mother and father of patients E and F; Dr. Eden, an expert in the field of pediatrics; and the Appellant herself. Additionally, the Board reviewed 28 exhibits. Throughout the hearings, Appellant had numerous opportunities to call witnesses on her behalf and submit evidence to substantiate her claims. At no time during the proceedings did Appellant attempt to do so. Moreover, the Board's decision includes a thorough analysis of its finding on each charge and explained in detail the evidence upon which they based their decision. Consequently, this Court finds that the Board's decision was not arbitrary or capricious.
V. Investigatory, Adjudicatory and Advisory Functions
The Appellant argues that Attorney Bruce McIntyre (McIntyre), who prosecuted the instant action, commingled functions as prosecutor and witness. Appellant contends that throughout the proceedings McIntyre injected questions that suggested McIntyre's firsthand knowledge of events and his own characterization of what had occurred. The Board counters by arguing McIntyre's role as prosecutor was wholly appropriate and did not unfairly taint the proceedings. The Board argues that this subject is thoroughly covered by Rule 3.7 of the Rhode Island Rules of Professional Conduct. The Board further contends that Appellant's attempt to prohibit McIntyre from acting as prosecutor in the present case is a harassing technique that is without merit. This Court finds that the Board's decision to allow Attorney Bruce McIntyre to prosecute the case was entirely proper.
In El Gabri v. Rhode Island Board of Medical Licensure and Discipline, 1998 R.I. Super. LEXIS 36, the Rhode Island Superior Court addressed a similar argument made by an appellant who was challenging the Board's decision to revoke his license. The appellant claimed that McIntyre's role as prosecutor and advisor to the Board was unconstitutional. The Superior Court rejected appellant's argument and concluded that McIntyre's dual role as prosecutor and advisor to the Board was not violative of due process because nothing in the record demonstrated that McIntyre exercised influence over the Hearing Committee. El Gabri, 1998 R.I. Super. LEXIS at 33-34. "Broadly speaking, the separation of functions that prevails in a modern administrative agency, allotting the prosecutorial function to a staff of attorneys or other personnel who will not participate in the eventual decision, is a common and recommended feature of American administrative enforcement activity." La PetiteAuberge v. Rhode Island Comm'n for Human Rights, 419 A.2d at 284 (R.I. 1980). As was the appellant's argument in El Gabri, the argument made by the Appellant in the present case is without merit. There was nothing in the record to suggest that Attorney McIntyre exercised any influence over the Hearing Committee's decision. Moreover, the record demonstrates that McIntyre acted squarely within the boundaries of his role as prosecutor.
VI. Sanctions
Finally, during Court hearings, the Appellant argued that the sanction of indefinite suspension of her medical license was excessive in light of other medical board disciplinary sanctions that could have been imposed. The Board holds that suspension of Dr. Mills's license is the appropriate sanction until she submits to physical and psychiatric examinations conducted by medical professionals pre-approved by the Board. This Court finds that the Board did not err in using their discretion to reach what they deemed to be an appropriate sanction for Dr. Mills's unprofessional conduct.
This Court will not substitute its judgment for that of the Board concerning the appropriate discipline for the Appellant, as a Medical Board is in the best position to make determinations as to what constitutes an appropriate sanction. See Jack Marrs, M.D. v. MichiganBoard of Medicine, 375 N.W.2d 321, 324 (Mich. 1985) (holding that the Court of Appeals erred in finding that the Board abused its discretion in imposing a one-year suspension for a doctor's failure to conform to prevailing minimum professional standards); see also State of Rhode IslandDepartment of Corrections v. Rhode Island Brotherhood of CorrectionalOfficers, 725 A.2d 296 (R.I. 1999) (declaring that an arbitrator improperly substituted his judgment for that of the director regarding what the proper disciplinary action should be). A Medical Board is empowered to impose discipline as it deems proper. Bryce v. Board ofMedical Quality Assur., 184 Cal.App.3d 1471 (Cal.App. 4 Dist. 1984). Regarding the imposition of discipline,
 "it is well settled that in reviewing the penalty imposed by an administrative body which is duly constituted to announce and enforce such penalties, neither a trial court nor an appellate court is free to substitute its own discretion as to the matter; nor can the reviewing court interfere with the imposition of a penalty by an administrative tribunal because in the court's own evaluation of the circumstances the penalty appears to be too harsh. Such interference . . . will only be sanctioned when there is an arbitrary, capricious, or patently abusive exercise of discretion." Shakin v. Board of Medical Examiners, 254 Cal.App.2d 102 (Cal.App. 2nd Dist. 1967).
Thus, this Court finds that the suspension of Appellant's license was the appropriate sanction imposed in relation to the well-supported findings of the Board and did not constitute an abuse of discretion.
During oral arguments before this Court, the Appellant requested that this Court modify the sanction to include a provision that a psychiatrist of the Appellant's own choosing be permitted to attend the psychiatric examination the Board is requiring her to undergo before she can be considered for reinstatement. This Court's consideration of such a request would be inappropriate and would constitute a substitution of its judgment in place of the Board's as to the conditions of Appellant's reinstatement.
Conclusion
After review of the entire record, this Court finds the decision of the Board was supported by the reliable, probative, and substantial evidence in the record, and was not affected by error of law. Furthermore, this Court finds that the Board's decision was not arbitrary or capricious or an abuse of discretion. Thus, the substantial rights of Appellant have not been prejudiced. For the reasons stated herein, the decision of the Board, which finds the Appellant in violation of 1956 R.I.G.L. §5-37-5.1, is affirmed. Counsel shall prepare an appropriate judgment for entry.
[1] Dr. Eden has been practicing pediatrics since 1988 and at the time of the proceedings had been licensed in Rhode Island for six years. He attended Boston University School of Medicine, and upon graduation came to Rhode Island as a pediatric resident and spent three years at the Rhode Island Hospital, Brown University Program. Upon completion of his pediatric residency training, Dr. Eden worked in Brockton Hospital for two years as a pediatrician. Since 1994, Dr. Eden has worked as the founding member of Children's Medical Group, a pediatric practice on the campus of Rhode Island Hospital.